**TRANSPORTES AEREOS de ANGOLA, Plaintiff,**

v.

**RONAIR, INC., Jet Traders Investment Corporation d/b/a Commercial Air Transport Sales, and Nigel Winfield, Defendants.**

**Civ. A. Nos. 81–120 LON, 79–363 LON.**

United States District Court, D. Delaware.

Aug. 17, 1988.

F. Alton Tybout of Tybout, Redfearn, Casarino & Pell, Wilmington, Del. (Emily M. Bass of Winter & Bass, New York City, of counsel), for plaintiff.

Nigel Winfield, Miami, Fla., pro se and for defendants.

## OPINION

LONGOBARDI, District Judge.

Plaintiff Transportes Aereos de Angola ("TAAG") filed a motion for partial summary judgment with this Court on August 7, 1986. Docket Item ("D.I.") 402. Plaintiff seeks summary judgment as to its claim for breach of contract and conversion (D.I. 426, Counts Six and Seven), as well as to the defenses and counterclaims raised by Defendants regarding those claims. The history and complexity of this litigation is well documented in earlier opinions of this court and requires little elaboration here.[1]

---

1. The first amended complaint, D.I. 50, named Ronair, Inc., Jet Traders and Nigel Winfield as Defendants. However, on April 19, 1984, TAAG moved to dismiss its complaint against Ronair with prejudice (D.I. 152) and the court, after a hearing, granted TAAG's motion on May 7, 1984.

*See, e.g., Transportes Aereos de Angola v. Ronair, Inc.,* 104 F.R.D. 482 (D.Del.1985); *Transportes Aereos de Angola v. Jet Traders Inv.,* 624 F.Supp. 264 (D.Del.1985). However, a brief summation of the relevant facts will be helpful at this stage in the proceedings. The subject matter of this dispute involves the purchase of a Boeing 707–321F aircraft (hereinafter "N473 aircraft") by Plaintiff TAAG from Defendant Jet Traders Investment Corporation, d/b/a Commercial Air Transport Sales, (hereinafter "Jet Traders"). On May 11, 1979, Plaintiff entered into a written contract with Defendant Jet Traders for the purchase of the N473 aircraft (hereinafter "Purchase Agreement"). D.I. 434, Exhibit 1. Defendant Jet Traders agreed to sell and Plaintiff agreed to buy the aircraft for a sum of 7.5 million dollars with delivery to be made at the Wilmington Airport on or before June 25, 1979. *Id.* at Annexes 3, 7.

It is uncontroverted that Plaintiff made two payments totaling 6.55 million dollars under the Purchase Agreement which were a condition precedent to the delivery of the N473 aircraft. D.I. 434, Exhibits 1 and 2. The third and final payment of $950,000 was due upon delivery of the N473 aircraft. D.I. 434, Exhibit 1. It is also not disputed by either party that Defendant failed to make delivery of the N473 aircraft specified in the Purchase Agreement. *See* D.I. 83, ¶ 36; D.I. 91, ¶ 52. Furthermore, it is uncontroverted that Plaintiff notified Defendant Jet Traders on or about October 1, 1979, that it considered Defendant Jet traders "to be in breach of the Agreement and that it was demanding indemnification for capital and other losses incurred as a result of the non-availability of the Aircraft." C.A. No. 79–363, D.I. 325 at III, ¶ 2, quoting D.I. 10.[2] Defendants Nigel Winfield ("Winfield") and Jet Traders both admit that they have failed to refund any portion of the 6.55 million dollars paid by Plaintiff towards the purchase of the N473 aircraft. D.I. 83, ¶ 37; D.I. 91, ¶ 53. Finally, no party disputes the terms of the Purchase

Agreement nor has there ever been a question as to the adequacy of TAAG's consideration. D.I. 415 at 6.

As a result of Defendants' failure to deliver the N473 aircraft in accordance with the Purchase Agreement, Defendants allegedly made numerous attempts to obtain "substitute" aircraft. *See* D.I. 434, Exhibits 13, 14 and 20. The various proposed substitute aircrafts were a used Boeing 707 bearing serial number 19566, owned by Guiness Peat Aviation in the Fall of 1979 and a used Boeing 707 bearing serial number 19963, owned by Western Airlines in the Spring of 1980. D.I. 415 at 20–21.

## CONTENTIONS OF THE PARTIES

Plaintiff contends that no genuine issues of material fact remain as to Plaintiff's claims for breach of contract and conversion. Moreover, Plaintiff further argues that summary judgment is also appropriate as to Defendants' counterclaims. In support of its argument, Plaintiff contends there is no dispute that Plaintiff and Defendant Jet Traders entered into a valid and binding contract for purchase of the N473 aircraft. Furthermore, the contract was duly performed by Plaintiff while Defendants breached the agreement by failing to deliver the N473 aircraft. Moreover, Defendants wrongfully refused to refund any portion of the amount paid by Plaintiff towards the purchase of the N473 aircraft. In light of the uncontested facts surrounding the validity of the contract and the Defendants' failure to fulfill their obligation, no genuine issues of fact remain as to Defendants' breach of the Purchase Agreement. Plaintiff further argues that Defendant Winfield is liable in both his individual as well as his corporate capacity.

Plaintiff next argues that Defendants' affirmative defenses raised in response to Plaintiff's breach of contract claim must fail. Not only is the record devoid of any support for Defendants' three affirmative defenses of (a) contract modification; (b)

---

D.I. 169. *Transportes Aereos de Angola v. Ronair, Inc.,* 104 F.R.D. 482, 487 (D.Del.1985). Therefore, the remaining Defendants are Jet Traders and Nigel Winfield.

**2.** C.A. No. 79–363 was later consolidated with C.A. 81–120 on November 1, 1983. D.I. 119.

novation; and (c) accord and satisfaction but, more specifically, Defendants have failed to come forward with any facts to support their bald allegations. Defendants' counterclaims as to TAAG's alleged interference with Defendants' contractual relations, as well as Plaintiff's alleged breach of contract, are likewise unsupported by any facts in the record. Also, it is argued, therefore, Plaintiff is entitled to summary judgment as to those claims as well.

Finally, Plaintiff contends that Defendant Winfield is liable for conversion of the 6.5 million dollars deposited by Plaintiff into Jet Traders' account. The record is replete with uncontroverted evidence that Winfield converted Plaintiff's funds for his own personal use.

Defendants, on the other hand, argue that genuine issues of material fact remain as to Defendants' alleged breach of contract and, therefore, summary judgment is inappropriate. Furthermore, Defendants contend that they have substantially performed the contract and that any failure to deliver the N473 aircraft or the three different substitute aircrafts was the Plaintiff's fault and not because of any wrong doing on the part of the Defendants.[3]

DISCUSSION

In order to prevail upon a motion for summary judgment, the moving party must show that there are no genuine issues of material fact as to the subject matter of the motion. Fed.R.Civ.P. 56(c). Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Moreover, "summary judgment will not lie if the dispute about a material fact is 'genuine', that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.; accord, Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Furthermore, when a motion for summary judgment is properly supported, "an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See also, Securities and Exchange Commission v. Bonastia,* 614 F.2d 908, 914 (3rd Cir.1980) ("denials in the form of legal conclusions, unsupported by documentation of specific facts, are insufficient to create issues of material fact that would preclude summary judgment."); *Tilden Financial Corp. v. Palo Tire Serv., Inc.,* 596 F.2d 604, 607 (3rd Cir.1979) ("more than mere allegations are necessary to defeat a properly supported motion for summary judgment."). Unless the Plaintiff can prove that no genuine material issues of fact exist as to their claims for breach of contract and conversion, it cannot prevail upon its motion for summary judgment as to these issues.

While it is uncontroverted that Defendants do not dispute the terms and existence of the Purchase Agreement, they advance three affirmative defenses to their failure to deliver the N473 aircraft. *See* discussion, *supra.* Defendants contend that (1) the Purchase Agreement was modified; (2) a novation occurred; and (3) there was an accord and satisfaction.

■ The Court notes at the outset that, because jurisdiction in this case is based

---

**3.** Defendants' papers filed with this Court also contain various arguments alleging that Plaintiff's counsel, a one Michael Standard, is in reality the "principle author & director of present action." D.I. 420, Note 8 at 7. Given that Standard is not a party to this action, the Court finds these contentions irrelevant. Indeed, Defendants fail to cite to any portions of the record in support of their allegations. Defendants also argue that Defendant Winfield's past performance history demonstrates that "Winfield has always satisfied all obligations without problems and or friction." *Id.* at 2. Defendants' past and/or present performance history is likewise irrelevant to the issues before this Court.

upon diversity of citizenship, the Court must apply Delaware's choice of law rules to determine which State's substantive law will govern. *Klaxon Co. v. Stentor Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). *See also, F.E. Myers Co. v. Pipe Maintenance Services, Inc.,* 599 F.Supp. 697 (D.Del.1984); *Sellon v. General Motors Corp.,* 521 F.Supp. 978 (D.Del.1981). The Delaware courts have more recently moved away from the old choice of law rule which applied the law of the State where the contract was made and instead have utilized the more flexible and functional "most significant relationship to the transaction" test set forth in the Restatement (Second) of Conflict of Laws § 188(1) (1971). *F.E. Myers Co.,* 599 F.Supp. at 702. *See also, Process & Storage Vessels, Inc. v. Tank Service,* 541 F.Supp. 725, 729 (D.Del.1982); *Sellon,* 521 F.Supp. at 981. The principal factors a court must consider in applying this test are: (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties. *F.E. Myers Co.,* 599 F.Supp. at 702; Restatement (Second) of Conflict of Laws § 188(2) (1971).

Applying these factors to the facts of this case suggests that the law of Delaware should govern, although the question is a close one. The performance of the contract was to take place entirely in Delaware and the subject matter of the contract, the N473 aircraft, remained almost continuously in Delaware from June, 1979, through early August, 1979. *Transportes Aereos de Angola v. Ronair, Inc.,* 544 F.Supp. 858, 865 (D.Del.1982). Moreover, "Jet Traders' economic vitality was dependent to some extent on the performance of this contract in Delaware." *Id. See also,* D.I. 32, ¶¶ 10, 11. However, in weighing these factors, the Court also notes that there are a number of contacts with States other than Delaware. It is undisputed that the contract negotiations took place outside of Delaware and that the contract was executed in Lisbon, Portugal. Moreover, Defendant Jet Traders is incorporated in

Florida with its principal place of business in that State. Defendant Winfield is a resident and citizen of the State of Florida and, finally, negotiations between TAAG and Jet Traders leading to the execution of the contract took place primarily in Florida. *Id* at 864; D.I. 32, ¶ 2. Given that the contract specified that United States law, rather than Portuguese or Angolan law, would govern, the only State other than Delaware with any relationship to the instant transaction is Florida. Therefore, based upon the foregoing facts, the Court must determine whether Florida or Delaware law should apply to Plaintiff's claims for breach of contract.

Although some of the negotiations for the contract took place in Florida and the Defendants are located in that State, the Court does not find those contacts as significant as the Delaware contacts relating to the place of performance and the location of the N473 aircraft. Because no party disputes the formation of the terms of the contract itself, the place of negotiations bears little significance to Defendants' alleged failure to perform their contractual obligation to deliver the aircraft in Wilmington, Delaware. Therefore, the Court finds that, for the purposes of the instant claim, Delaware is the State with the most significant relationship to the transaction at issue. Accordingly, the Court will apply Delaware law to Plaintiff's claims for breach of contract. In addition, because the transaction involved a contract for the sale of goods, the Delaware Uniform Commercial Code–Sales ("Code") applies. 6 Del.C. §§ 2–102, 2–103.

As discussed *supra,* it is uncontroverted that the parties entered into a valid and binding contract. Moreover, no party disputes that Plaintiff made two contract payments totaling 6.5 million dollars and that Defendants both failed to return the money and to deliver the N473 aircraft. Therefore, in order for Plaintiff to prevail on its motion for summary judgment, the Court must determine whether any of the three defenses raised by Defendants create genuine issues of material fact.

■ Defendants' argument that the Purchase Agreement was modified by a subsequent agreement for a "substitute aircraft" must fail as a matter of law. Federal Rule of Civil Procedure 37(b) allows the imposition of sanctions for failure of a party to answer interrogatories. *See* 8 C. Wright & A. Miller, *Federal Practice and Procedure* § 2289 (1970). Pursuant to this Court's authority under Rule 37(b), sanctions were imposed upon Defendants for their failure to answer interrogatories on February 4, 1985. *Transportes Aereos de Angola,* 104 F.R.D. at 502. The court ruled, *inter alia,* that the "Agreement under which TAAG agreed to purchase and Jet Traders agreed to sell aircraft 19375 was never effectively modified or altered subsequent to its execution...." D.I. 325 at V, ¶ 3. The order further provides that both Defendant Winfield and Defendant Jet Traders are precluded from introducing any evidence or testimony contrary to that factual statement. *Id.* at V.[4] Given that Defendants are precluded from arguing that the Purchase Agreement was modified or altered in any way, the Court finds that no questions of material fact exist as to whether the Defendants' alleged offer to substitute the # 19375 aircraft constituted a valid modification of the Purchase Agreement. When a court imposes an order pursuant to Rule 37(b) deeming certain facts to be taken as established and precluding the introduction of any evidence or testimony to contradict those facts, there can be no challenge as to such facts.

■ Defendants alternatively argue that the parties entered into a new contract for a substitute aircraft to be provided to Plaintiff in lieu of the N473 aircraft as originally contracted.[5] In order to prove a novation, the moving party must demonstrate (1) a previous valid debt; (2) extinguishment of the old contract; (3) agreement of all parties to a new contract; and (4) validity of a new one. *Fontana v. James Julian,* Del.Ch., C.A. No. 5056, Hartnett, V.C. (Oct. 29, 1979). *See also, Berg v. Liberty Fed. Sav. & Loan Ass'n,* Del.Supr., 428 A.2d 347 (1981); *Schwartz v. Centennial Insurance Co.,* Del.Ch., C.A. No. 5350, Hartnett, V.C. (Jan. 16, 1980). The party asserting a novation bears the burden of proof and "expressed assent to give up the original debt is required." *Berg,* 428 A.2d at 349. While earlier cases suggest that a novation could be implied from the acts of the parties, in any event, the moving party must clearly demonstrate that a novation was intended. "The elements of a novation are essentially the same as in an original transaction and include a meeting of the minds of all parties as to the substitution of the new undertaking for the old." *Fontana,* C.A. No. 5056 at 4. Therefore, it is clear that, in order for the Defendants to establish that a novation occurred, they must show that the parties mutually assented to the substitution of a new and valid contract and that the original contract was extinguished.

Applying those requirements to the facts of the instant case, the Court finds that Defendants have easily satisfied the first requirement for a showing of novation: a valid preexisting debt, given that neither party disputes the validity of the contract to deliver the N473 aircraft. However, Defendants have failed to proffer any evidence which demonstrates that the original contract was extinguished by mutual

---

4. The record supports the fact that the original contract was never modified as acknowledged by defendants in a telex they sent to TAAG requesting that "TAAG signs jointly an amendment with CATS per section 15, Variation and Amendment of the original purchase agreement for N473RN legally confirming TAAG's agreement to N473N replacement by 19963." D.I. 434, Exhibit 14. Section 15 of the Purchase Agreement provides in pertinent part that "any amendment or variation to this Agreement shall only be made in writing and shall only be valid when signed by duly authorized representatives of both parties." D.I. 434, Exhibit 1.

5. Defendants do not present arguments detailing their defense of novation; rather, papers submitted on their behalf suggest simply that they substantially performed their contractual obligations in that substitute aircraft were obtained for Plaintiffs. D.I. 420 at 4, 11. However, because Defendants are at this stage *pro se,* the Court will construe Defendants' arguments liberally and assumes that Defendants are claiming that all of the elements of a novation have been met.

agreement of the parties and replaced with a valid new contract. Rather, the only evidence Defendants can put forward is the existence of an "Offer to Substitute" and a June 5, 1980 telex. D.I. 434, Exhibits 13, 20.

The "Offer to Substitute" dated June 4, 1980, contemplates that, upon its acceptance by TAAG, "pursuant to the substitution clause [of the Purchase Agreement], the replacement of aircraft *19963* (401) from Western Airlines for aircraft 19375 represented as owned by Tekair and sold to T.A.A.G. by Jet Traders Investment Corporation." D.I. 434, Exhibit 13. The Offer further provided that it could be accepted by TAAG on or before June 5, 1980. *Id.* Clearly, the Offer, therefore, acknowledges the continued validity and existence of Defendants' obligation under the original contract to deliver the N473 aircraft.[6] Moreover, the telex in response to Defendant Winfield's "Offer to Substitute" dated June 5, 1980, also suggests the continuing validity of the original contract. "Mr. Nigel Winfield shall negotiate with Western Airlines Aircraft [19963] in order to fulfill his duties toward TAAG Angola Airlines." D.I. 434, Exhibit 20 (translation).

Regardless of whether or not the telex constitutes an acceptance of Defendant Winfield's offer to substitute, it clearly contemplates the continued existence of the original contract. Therefore, although Winfield's testimony suggests that TAAG accepted his offer to substitute by virtue of the June 5 telex, the Court finds that Defendants have failed to satisfy the requirements of proving novation. Not only does the June 5 telex refer to the continued obligations of Defendant Winfield under the original contract but it also indicates TAAG's lack of intent to extinguish the original contract. Indeed, counsel for Defendant Winfield states at Winfield's deposition: "Clearly yesterday it was estab-

lished over and over and over again that there was no new agreement for 19963." D.I. 440D at 494, Deposition of Nigel Winfield dated July 19, 1984. Furthermore, Winfield testified that "the '63 aircraft would be applicable to the original contract." *Id.* at 493.

Based upon the foregoing facts, it is clear that Defendants have failed to come forth with evidence to support their claim that a new contract was entered into between the parties. Therefore, no genuine issue of fact remains as to their defense of novation. *See, e.g., Celotex Corp.*, 477 U.S. at 323–24, 106 S.Ct. at 2553 ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose."); *Houser v. Fox Theatres*, 845 F.2d 1225, 1231 n. 13 (3rd Cir.1988) (Defendants are not required to refute the affirmative elements of Plaintiff's claims; instead, they need only point out the absence or insufficiency of Plaintiff's evidence offered in support of those affirmative elements.).

Defendants finally argue that an accord and satisfaction was reached. One of the principal requirements of an accord and satisfaction is that a bona fide dispute exist as to the Defendants' obligations under the contract. *Modern Dust Bag Co. v. Commercial Trust Co.*, Del.Ch., 104 A.2d 378, 380 (1954); *State for Use of Warner Co. v. Massachusetts Bonding & Ins. Co.*, Del. Super., 9 A.2d 77, 80 (1939). The dispute must be honest, genuine and "advanced in good faith and resting on a substantial basis, and founded on some reasonable, tenable, or plausible ground." *Modern Dust Bag Co.*, 104 A.2d at 380. An accord and satisfaction also requires proof of mutuality of intent between the parties "to accept something that is new or different

---

**6.** Defendant Winfield's testimony reveals that Winfield himself viewed the offer to substitute the 19963 aircraft for the originally contracted for N473 aircraft as being contingent upon TAAG's acceptance.

  Q. Were you looking for an acceptance from Mario Von Haff?

A. Yes. In my opinion he was authorized and had the authority to accept this in its present form.
Q. Did he give you such approval?
A. He said he would need to read it. I don't know what he would do with it, call Angola, read it or telex this to Julio.
D.I. 440B at 315.

from what a party was originally entitled to." *Allied Builders, Inc. v. Heffron*, Del. Supr., 397 A.2d 550, 552 (1979). Therefore, it necessarily follows that "[t]here can be no accord without the making of a new contract." *Id.* If, however, the obligor breaches the contract of accord, the obligee may enforce either the original duty or the accord. *Estes v. Brountas*, Del.Ch., C.A. No. 5522, Brown, V.C. (Sept. 4, 1980). Unlike a novation which results in the extinguishing of the original obligation, an accord and satisfaction looks to the performance of the new agreement to satisfy the promisor's obligation to the promisee.

■ Turning to the first requirement of an accord and satisfaction, the Court must consider whether Defendants have put forth any evidence to show the existence of a bona fide dispute as to their obligations under the Purchase Agreement. As discussed *supra*, however, Defendants have never disputed in any of their papers presented to this Court their obligations under the contract to deliver to Plaintiff the N473 aircraft. Furthermore, because this Court has held as a matter of law that the contract was never modified, Defendants cannot now claim that their obligations have somehow changed from their original obligation to deliver the N473 aircraft. *See* D.I. 325. Finally, the only two pieces of evidence Defendants can show to support their claim that an accord and satisfaction was reached are the June 5, 1980, telex and the Offer to Substitute. D.I. 434, Exhibits 13, 20.

■ Even were the Court to find that Defendants have offered sufficient facts to demonstrate the existence of a bona fide dispute, Defendants have failed to proffer any evidence to show the existence of a new contract. Indeed, as discussed *supra*, Winfield acknowledged during his July 18, 1984, deposition that no new agreement was signed regarding the 19963 aircraft. D.I. 440C at 442–444. Rather, Winfield consistently maintained the 19963 aircraft was the substitute aircraft applicable to the original contract. D.I. 440D at 493, July 19, 1984 Deposition of Nigel Winfield. Moreover, it is uncontested that at no time did "neither Nigel Winfield nor any corporate entity created, controlled or owned by him, in whole or in part, ever [own] or [have] title to Aircraft No. 19963." D.I. 325, at III, ¶ 1, quoting D.I. 164. As a result, any attempts that Defendants made to reach an accord and satisfaction by substitution of the 19963 aircraft for the N473 aircraft were necessarily unsuccessful given that they never had title to the 19963 aircraft.[7] Therefore, the record does not reflect, nor do Defendants put forth, any evidence suggesting that an accord and satisfaction was reached.[8] Moreover, the Court notes that Defendants' affirmative defenses of both novation and accord and satisfaction not only fail for the reasons set forth above but this court's order imposing sanctions makes it perfectly clear that the only contract in existence between these parties was the Purchase Agreement for the 19375 aircraft. D.I. 325. Indeed, the facts deemed admitted pursuant to this court's order, taken in their totality, are further evidence that neither an accord and

---

7. In point of fact, at the time Winfield presented TAAG with the "Offer to Substitute", the 19963 aircraft was owned by Western Airlines. Defendants not only never owned the 19963 aircraft but at no time did "Winfield either execute a contract or conclude an agreement to purchase aircraft No. 19963 ... from Western Airlines, nor did he cause anyone else to do so", nor did they ever possess sufficient funds with which to purchase the aircraft. D.I. 325 at III, ¶ 1, quoting D.I. 164; V, ¶ 5.

8. As discussed *supra*, Defendants "may not rest upon the mere allegations or denials of [their] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial."

*Anderson v. Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510 (citations omitted). Defendants' papers do not contain any specific facts or documents to support their allegations, rather, they rely upon mere conclusory statements. The Court notes that despite Defendants' failure to come forth with evidence, the Court has utilized extreme diligence in going through a voluminous record in order to find any evidence that could conceivably support Defendants' claims. Notwithstanding Defendants' failure to aid the Court, upon consideration of the record as a whole, Defendants cannot demonstrate that a material question of fact exists as to their claim that an accord and satisfaction was reached.

satisfaction or a novation occurred between these parties. *Id.*

Having determined that Defendants' affirmative defenses to Plaintiff's claim for breach of contract are unsupported by evidence in the record, the Court must next consider whether any of the counterclaims raised by Defendants would preclude granting Plaintiff summary judgment. Defendants' counterclaims essentially allege that Plaintiff breached its contracts with Defendant Jet Traders and also interfered with Jet Traders' contract rights by purchasing the 19963 aircraft and 19965 aircraft directly from Defendants' supplier, Western Airlines. D.I. 83, Answer of Defendant Jet Traders.[9]

The Court will first consider the Defendants' claims as to the 19963 aircraft. As discussed *supra*, the Court has found that there was no new contractual agreement between TAAG and Defendants for the purchase of the 19963 aircraft. Therefore, Defendants' counterclaim for breach of an alleged agreement TAAG had with Defendants to accept the 19963 aircraft as a substitute for the N473 aircraft must fail. It necessarily follows that Plaintiff would be free to contract directly with Western Airlines for the purchase of the 19963 aircraft. Moreover, Defendants had no contractual right to the purchase of the 19963 aircraft from Western Airlines because they never had a contract with Western Airlines. This court has held that "At no time did Nigel Winfield either execute a contract or conclude an agreement to purchase Aircraft [No.] 19963 from Western Airlines, nor did they cause anyone else to." D.I. 325 at III, ¶ 1, quoting D.I. 164. It is well established that in order to have a cause of action for tortious interference with contractual relations, the moving party must show: (1) the existence of a contract; (2) about which the defendant knew; and (3) an intentional act which was a significant factor in causing the breach of

such contract (4) without justification and (5) which causes injury. *Irwin & Leighton v. W.M. Anderson Co.*, Del.Ch., 532 A.2d 983, 992 (1987). In the instant case, because Defendants cannot even show the existence of a contract, there can be no claim for contractual interference. Moreover, Defendants did not even possess sufficient funds to purchase the 19963 aircraft. D.I. 325 at V ¶ 5. For the foregoing reasons, Defendants' counterclaims as to the 19963 aircraft must fail.

The Court will next consider Defendants' counterclaims concerning the 19965 aircraft. The contract between Commercial Air Transport Sales ("CATS") and TAAG was part of an agreement to exchange a used Boeing 707 cargo plane ("D2-Tag") owned by TAAG for the 19965 aircraft then owned by Western Airlines. D.I. 440C at 441, July 18, 1984, deposition of Nigel Winfield. The contract for the 19965 aircraft specified that delivery was to be on or before June 26, 1980. D.I. 434, Exhibit 22. Therefore, in order for Defendants to fulfill their obligations under the contract, they would have had to purchase the 19965 aircraft from Western Airlines prior to June 26, 1980. This court has determined, however, that "Neither Winfield nor Jet Traders, or entities controlled by them, had sufficient funds, assets or credits with which to purchase ... Aircraft No. # 19965 from Western Airlines from May 31, 1980 through July 16, 1980." D.I. 325 at V, ¶ 5. Therefore, Defendants were never in a position to fulfill their own contractual obligations to provide Plaintiff with the 19965 aircraft. In addition, as a result of Defendants' refusal to accept delivery of the D2-Tag, Plaintiff notified Defendants that it was cancelling their agreement regarding the 19965 aircraft. D.I. 434, Exhibit 38. Based upon the foregoing uncontroverted facts, Defendants' counterclaim alleging breach of its contract re-

---

9. Defendants also allege that Plaintiff interfered with their contract with Jet Traders in that Plaintiff negotiated directly with Ronair and Tekair, Ltd. for the N473 aircraft which was the subject of the Purchase Agreement. D.I. 83,

¶ 80. Defendants have put forth no evidence to support such an allegation nor does the record contain any such evidence. Therefore, the Court dismisses that allegation as frivolous and wholly without merit.

garding the 19965 aircraft must fail.[10]

With regard to the Defendants' allegations of interference with contract rights, this court has determined that neither Winfield nor any entity controlled by him ever had a contract with Western Airlines to purchase the 19965 aircraft. D.I. 325 at III, ¶ 1, quoting D.I. 164. Therefore, as with the 19963 aircraft, there was never any contract concerning the 19965 aircraft with which Plaintiff could be liable for interference.

In conclusion, the Court finds that Defendants' counterclaims regarding the N473, 19965 and 19963 aircrafts are wholly unsupported by any facts in the record. As a result, because Defendants' affirmative defenses as well as their counterclaims are unsupported in the record, Plaintiff's motion for summary judgment as to its claim for breach of contract is hereby granted.

Plaintiff also seeks summary judgment as to Defendant Winfield's individual liability on the theory that Winfield is in reality the "alter ego" of the corporation. It is well recognized that courts will not entirely disregard the corporate form and only do so when unusual circumstances require an exception to the general rule that the corporate entity should be recognized and upheld. *Anderson v. Abbott*, 321 U.S. 349, 362, 64 S.Ct. 531, 537, 88 L.Ed. 793 (1944) ("Limited liability is the rule, not the exception ... [but] a surrender of that principle of limited liability [will] be made 'when the sacrifice is essential to the end that some accepted public policy may be defended or upheld.' ") (citations omitted); *Zubik v. Zubik*, 384 F.2d 267, 273 (3rd Cir.1967) ("any court must start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception.") When, however, the corporate form is misused, courts will pierce the corporate veil in order to "prevent fraud, illegality, or injustice, or

when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime." *Zubik*, 384 F.2d at 272.

Turning to the facts in the instant case, Plaintiff contends that Winfield "has as much as admitted that he is indistinguishable from the corporation." D.I. 415 at 12. Plaintiff submits that two corporate documents "reinforce" that admission because they clearly establish that Winfield was merely using the corporate form as a means of perpetrating a fraud and conducting his own personal business. *Id.* The first document is a "Memorandum of Understanding" which states that Winfield secured the contract "alone" and that the corporation "was used as the vehicle to receipt the payment." D.I. 434, Exhibit 8. The memorandum further provides that "The responsibility for the disposition of the Angola funds lies solely with Nigel J. Winfield." *Id.* The document is signed by Nigel Winfield and Jennings Crawford, the only other corporate officer of Jet Traders. The Court finds that this document does not provide sufficient evidence of an abuse of the corporate form. The fact that one corporate officer is solely responsible for the disposition of certain funds does not warrant disregarding the corporate form. The second document, a corporate resolution of Jet Traders Investment Corp. signed by its only director, Nigel Winfield, provides that Winfield is alone entitled to "all profits and losses resulting from the [Angolan] transaction." D.I. 434, Exhibit 9. Once again, the Court is not persuaded that such an action on the part of the sole director of a corporation is *per se* invalid. The fact that Winfield was alone entitled to any profits or losses resulting from the TAAG transaction does not, of and in itself, demonstrate that the corporation, Jet Traders, was set up merely as a vehicle for Winfield to conduct his own personal, as opposed to corporate, business. While

10. Because the Court finds that neither Defendants nor any entitles controlled by them, were ever in a position to perform their contractual obligations under the agreement regarding the 19965 aircraft, the Court need not reach the issue raised in Plaintiff's brief concerning their

argument that Jet Traders, d/b/a Commercial Air Transport Sales, is a distinct entity from Commercial Air Transport Sales and that Jet Traders may not, as a matter of law, assert counterclaims on behalf of CATS. *See* D.I. 415 at 53–59.

Winfield might have exercised sole control over the TAAG transaction, there is no evidence to suggest Winfield dominated all of Jet Traders' transactions. Moreover, Jennings Crawford, the only other corporate officer, agreed to Winfield's control over the TAAG transaction. In point of fact, the Memorandum of Understanding clearly established that Crawford has no equity interest in the TAAG transaction. D.I. 434, Exhibit 8.

Plaintiff also argues that further evidence of Winfield's domination over and misuse of the corporate form lies in his "oscillation" of funds through corporate and private accounts. D.I. 415 at 15. *See also* D.I. 434, Exhibit 10. However, the Court does not find clear evidence of such "oscillation" in the chart provided by Plaintiff which reflects monthly balances in various accounts to which Winfield had access. In addition, the chart fails to demonstrate that Jet Traders was "grossly undercapitalized and probably incapable of purchasing a used Boeing 707 aircraft for TAAG." D.I. 415 at 17.

Based upon the facts before the Court, Plaintiff has failed to come forth with sufficient evidence to warrant "piercing the corporate veil" and holding Winfield personally liable. The Court is not persuaded that Winfield used Jet Traders as "a mere shell and subterfuge for his personal actions and fraudulent schemes." D.I. 415 at 14–15. Accordingly, Plaintiff's motion for summary judgment as to Winfield's personal liability is hereby denied.

■ Plaintiff also seeks summary judgment as to Count Seven of its complaint which alleges that Defendant Winfield is liable for conversion of the 6.5 million dollars TAAG paid for the N473 aircraft.[11] Just as with Plaintiff's claim for breach of contract, the Court must first determine which State's law will govern the claim for conversion. *Klaxon Co.*, 313 U.S. at 496, 61 S.Ct. at 1021. Delaware courts still

adhere to the traditional choice of law rule of *lex loci delicti*—the law of the place of injury in tort cases.[12] Accordingly, because the alleged injury occurred in Florida, Florida's law of conversion will apply. It is undisputed that the two contract payments at issue were deposited in Defendants' Florida accounts and allegedly removed from those accounts. Therefore, the Court must determine whether summary judgment is appropriate under Florida's law of conversion.

■ Florida law recognizes that "conversion is an unauthorized act which deprives another of his property permanently or for an indefinite time." *Senfeld v. The Bank of Nova Scotia Trust Co. (Cayman)*, 450 So.2d 1157, 1160–61 (Fla.App. 3 Dist. 1984). *See also Nat. U. Fire Ins. Co. of Pa. v. Carib Aviation*, 759 F.2d 873, 878 (11th Cir.1985) ("essence of the test is not the acquisition of the property; rather, it is the wrongful deprivation"); *All Cargo Transport v. Florida East Coast Railway Co.*, 355 So.2d 178 (Fla.App. 3 Dist.1978) (money may be the subject of conversion where there was exercised a positive, overt act or acts of dominion over the money inconsistent with and adverse to the rights of the true owner). Plaintiff argues that money is properly the subject of a conversion so long as it is sufficiently identifiable. Plaintiff further argues that Florida law recognizes that when a purchaser specifically designates an amount of money to be used for a specific purpose, the seller may not use it for another purpose. D.I. 415 at 68–69. The Court agrees with Plaintiff that Florida courts allow actions, under certain circumstances, for the conversion of specifically identifiable sums of money where the party receiving such sums knows he has no right to take them and refuses to return them. *Aero Intern. Corp. v. Fla. Nat. Bank of Miami*, 437 So.2d 156 (Fla.App. 3 Dist.1983). *See also Senfeld*, 450 So.2d at 1161.

---

11. Plaintiff, in its complaint, also alleges a cause of action for conversion against Jet Traders but, in its papers, only seeks summary judgment as to Defendant Winfield's liability for conversion. *Compare*, D.I. 426 with D.I. 415 at 61, *et seq.*

12. As discussed *supra*, in contract cases, the Delaware courts are adopting the more flexible "most significant relationship to the transaction" test.

Plaintiff argues that Defendant Winfield's failure to refund the 6.5 million dollars paid by TAAG for the purchase of the N473 aircraft constitutes a wilful and malicious conversion. Because no one disputes that the funds are identifiable and were clearly used for Winfield's personal use rather than for the purchase of the N473 aircraft, Plaintiff contends it is entitled to summary judgment as to Winfield's liability for conversion. In the instant case, however, the Court is not persuaded that the contract terms for the purchase of the N473 aircraft stated that the contract payments TAAG was to make to Defendants were to be used specifically for the purchase of the N473 aircraft. Rather, the payment schedule merely states the amounts to be deposited in the seller's account. D.I. 434, Exhibit 1, Annex 3, and Exhibit 2. The contract terms not only fail to designate the payments for a specific purpose but Winfield's initial obligation under the contract was to deliver an aircraft, not to return the funds. Therefore, the Court finds that Plaintiff has failed to demonstrate that Defendant Winfield is liable for the conversion of a specifically identifiable sum of money which was earmarked for a particular purpose.

■ Moreover, the Court also finds that the basis for Plaintiff's claim of conversion lies in its claim for breach of contract. Defendant Winfield's use of the 6.5 million dollars is wrongful because, Plaintiff contends, he breached his contractual obligation to deliver the N473 aircraft. The fact that Plaintiff is really seeking damages for breach of contract is further reinforced by its Complaint; the damages sought for conversion are identical to those sought for breach of contract. D.I. 426. Florida courts do not generally recognize claims for conversion when they are based upon a breach of contract. In *Rosen v. Marlin,* 486 So.2d 623, 626 (Fla.App. 3 Dist.1986), the court held that a breach of contract to pay money does not generally constitute conversion under Florida law.

*See also Futch v. Head,* 511 So.2d 314, 321 (Fla.App. 1 Dist.1987) (where contract damages not distinct from damages stemming from conversion, no independent tort of conversion can stand as a matter of law); *Douglas v. Braman Porsche Audi, Inc.,* 451 So.2d 1038, 1039 (Fla.App. 3 Dist.1984) (an action in tort is inappropriate where the claim is based on a breach of contract); *Belford Trucking Co. v. Zagar,* 243 So.2d 646, 648 (Fla.App. 4 Dist.1971) ("A mere obligation to pay money may not be enforced by a conversion action; an action in tort is inappropriate where the basis of the suit is contract, express or implied."). The Court is not persuaded that Plaintiff has demonstrated that Defendants are liable for the independent tort of conversion. Because the Court finds that Plaintiff's claim for conversion is based upon a breach of contract, the Court will deny Plaintiff's motion for summary judgment as to Defendants' liability for conversion.

■ Because the Court finds that Plaintiff has failed to establish Defendant Winfield's liability for the independent tort of conversion, Plaintiff's claim for treble damages pursuant to section 812.035(7) of the Florida Statutes (Supp.1984), the civil remedies section of Florida's theft statute, known as the "Anti–Fencing" Act is without merit.[13] Florida law is settled on the question of treble damages recovery for breach of contract. In *Rosen,* 486 So.2d at 624, the court held that "recovery of damages for breach of contract will not support a trebling of such damages pursuant to the provisions of Sec. 812.035(7) ... that such trebling is only warranted when there is no contractual relationship between the parties." *Accord, Futch,* 511 So.2d at 320 (where no contractual relationship between the parties, no trebling allowed under section 812.035(7)). For all of the foregoing reasons, Plaintiff's motion for summary judgment as to Count Six of its complaint is hereby granted. Plaintiff's motion for summary judgment as to Count Seven of

13. Section 812.035(7) provides in pertinent part: "Any person who is injured in any fashion by reason of any violation of the provisions of §§ 812.012–182–037 ... has a cause of action for three-fold actual damages sustained.... Such person shall also recover court costs and reasonable attorneys' fees in the trial and appellate courts."

its complaint is hereby denied. An order will issue in accordance with this opinion.